**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **JACKIE DICKSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:06cv0886** |
| | ) | |
| **SIZEMORE SECURITY INTERNATIONAL, INC.,** | ) | **Judge Thomas A. Wiseman, Jr.** |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION**

Plaintiff Jackie Dickson filed suit in September 2006 in Rutherford County Chancery Court against his former employer, Defendant Sizemore, Inc. d/b/a Sizemore Security, incorrectly named in the pleadings as Sizemore Security International, Inc. ("Sizemore"), asserting claims arising from the termination of his employment under Tennessee common law and the Tennessee Public Protection Act, Tenn. Code Ann. § 50-1-304. Sizemore removed the case to federal court on the basis of diversity jurisdiction, 28 U.S.C. § 1332.

Sizemore now has filed a motion for summary judgment (Doc. No. 14) on the grounds that discovery has been completed, there are no disputed issues of material fact, and the undisputed facts demonstrate that Sizemore is entitled to judgment in its favor as a matter of law. The motion has been fully briefed and is ripe for consideration. As discussed below, the court will grant Sizemore's motion and dismiss this matter with prejudice.

## I. STATEMENT OF FACTS

Sizemore contracts with Bridgestone/Firestone to provide "round-the-clock" security services at Bridgestone's LaVergne, Tennessee facility. Sizemore's security personnel includes both Security Officers and Safety Officers. The Security Officer position is considered an entry-level job while the Safety Officer position is a more advanced position. Both Safety Officers and Security Officers report directly to a Captain, who reports to the Regional Manager. Neither Security Officers nor Safety Officers have any supervisory responsibilities or authority.

Plaintiff Jackie Dickson began working for Sizemore as a Captain, a supervisory position, on March 27, 2000.[1] He worked as Captain for about six months before being demoted to Safety Officer. At all times relevant to this litigation, Dickson was employed as a Safety Officer with no supervisory authority. He reported directly to Captain Larry Earls, who reported to Regional Manager Kent White. White, as Regional Manager at all times relevant to Dickson's claims, was responsible for issuing disciplinary actions up to and including termination. Over the course of his employment, Dickson was "counseled" on disciplinary issues at least three times by Kent White for violations of Sizemore's Code of Conduct: (1) in January 2005 for allegedly making racist and sexist remarks to a co-worker and for belittling his direct supervisor; (2) in March 2006 for failure to properly perform his duties; and (3) in April 2006 for misusing company property and being disrespectful to a manager. Each of these incidents was documented with a Formal Counseling Statement and by witness statements from the employees whose reports led to the counseling statement. (*See* Doc. No. 14-12 and -13.) Dickson signed the first two Counseling Statements, indicating he "disagreed" with his supervisor's description of the events, but he did not file a grievance in response to either disciplinary action. The third time he was issued a Formal Counseling Statement, he refused to sign the form and again denied any wrongdoing. Kent White told him at that point that if he engaged in another "purposeful infraction" of Sizemore's standard of conduct, he would be let go. (White Dep. at 76: 12–18.)

A fourth counseling conference took place on or about June 28, 2006, ostensibly intended to address another alleged incidence of insubordinate behavior by Dickson toward Captain Earls on May 31, 2006, concerning disposition of a broken chair. During that meeting, White asked Dickson if he wanted to resign, in response to which Dickson answered, "No, I want you to fire me." At the same meeting, Dickson called his direct supervisor, Larry Earls, a "lying dog" and a "liar" in White's presence. Dickson was terminated at that meeting for insubordination and "causing or contributing to disharmony in the work place." (Doc. No. 14-13, at 15.)

Dickson subsequently filed this lawsuit alleging that he was fired in retaliation for (1) telling his co-worker, Adrianna Watson, that he would testify at the trial of her sexual discrimination suit against

[1] Prior to March 2006, Dickson was employed by Allied Security as a Captain at the same Bridgestone facility. Allied Security lost its contract with Bridgestone and Sizemore acquired the contract.

Sizemore and (2) his preparing and filing a report concerning his supervisor's failure to remedy a safety problem involving the broken chair.

## II. STANDARD OF REVIEW

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." "A fact is 'material' and precludes grant of summary judgment if proof of that fact would have [the] effect of establishing or refuting one of the essential elements of the cause of action or defense asserted by the parties, and would necessarily affect [the] application of appropriate principle[s] of law to the rights and obligations of the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quoting Black's Law Dictionary 881 (6th Ed.1979)); other citations omitted). The Court must view the evidence in a light most favorable to the nonmovant and draw all reasonable inferences in the nonmovant's favor. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Bender v. Southland Corp.*, 749 F.2d 1205, 1210–11 (6th Cir. 1984).

The movant bears the burden of demonstrating the absence of all genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The initial burden on the movant is not as formidable as some decisions have indicated. The moving party need not produce evidence showing the absence of a genuine issue of material fact; rather, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. Once the moving party discharges that burden, the burden shifts to the nonmoving party to set forth specific facts showing a genuine triable issue. Fed. R. Civ. P. 56(e); *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 861 (6th Cir. 1986).

To create a genuine issue of material fact, however, the nonmovant must do more than present some evidence on a disputed issue. As the United States Supreme Court has stated, "[t]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the [nonmovant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986) (citations omitted). The standard for summary judgment mirrors the standard for a directed verdict under Rule

50(a). *Anderson*, 477 U.S. at 250. Consequently, a nonmovant must do more than raise some doubt as to the existence of a fact; the nonmovant must produce evidence that would be sufficient to require submission to the jury of the dispute over the fact.

## III. DISCUSSION AND ANALYSIS

Sizemore argues that (1) Dickson has not properly asserted a claim under the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101 *et seq.* ("THRA"), and has abandoned his common-law retaliatory discharge claim, so the only claim properly before the Court is Dickson' statutory TPPA claim; (2) even if the Court finds Dickson has stated a claim under the THRA, that claim fails on the undisputed facts; and (3) Dickson's TPPA claim likewise fails on the undisputed facts.

### A. Plaintiff's THRA Claim Is Properly Before the Court.

Plaintiff's Complaint specifically articulates causes of action for retaliation in violation of the TPPA and Tennessee common law. (Compl. ¶ 10.) It does not indicate an intent to state a claim under the THRA. On November 1, 2006 the parties submitted a Joint Proposed Case Management Order in which Plaintiff described his theory of recovery as a cause of action for retaliation under the TPPA only; he did not reference a common-law claim for retaliation or the THRA. (Doc. No. 5.) In the same proposed order, the parties agreed to a November 21, 2006 deadline for amending the pleadings. The Court entered that order November 8, 2006. On February 20, 2007, however, Plaintiff filed a motion seeking to modify the deadline for amending his complaint to add a cause of action for retaliatory discharge in violation of the THRA. Magistrate Judge Bryant issued an order granting that motion on March 15, 2007, noting simply that "[t]he case management order (Docket Entry No. 6) is hereby **MODIFIED** to allow the plaintiff to assert a claim under the Tennessee Human Rights Act, T.C.A. § 4-21-301," without specifying a date specified for filing an amended pleading. (Doc. No. 13.) Plaintiff has never filed an amended complaint to include reference to a cause of action under the THRA. On that basis, Sizemore asserts as an initial matter that there is no THRA claim properly before the Court.

In response, Dickson argues that because Judge Bryant granted his motion without specifying a date for filing an amended complaint, the plaintiff understood that no further pleading was necessary "as the Court had acknowledged the claim in its Order." This Court further notes that the facts asserted in the original Complaint were likely sufficient to support a claim for violation of the THRA, such that no

amendment would technically have been necessary, given the broad language of Fed. R. Civ. P. 8(a). The Court therefore finds, for purposes of the defendant's motion, that Dickson's THRA claim is properly before the Court.

**B. Plaintiff's THRA Claim Is Not Supported by the Undisputed Facts.**

The THRA prohibits retaliation against an employee who "has opposed a practice declared discriminatory by [the THRA], or because such person has made a charge, filed a complaint, testified, assisted or participated in any manner in any investigation, proceeding or hearing." Tenn. Code Ann. § 4-21-301(1). Thus, in order to establish a claim for violation of that section, a plaintiff must show that (1) he engaged in activity protected by statute; (2) his employer had knowledge of his exercise of protected activity; (3) the employer thereafter took an adverse employment action against him; and (4) a causal connection exists between the protected activity and the adverse employment action. *Newsom v. Textron Aerostructures, a div. of Avco, Inc.*, 924 S.W.2d 87, 96 (Tenn. Ct. App. 1995). If the plaintiff succeeds in establishing each element of his *prima facie* case, then the burden shifts to his employer to articulate a legitimate, non-retaliatory reason for taking the adverse action. At that point, the burden shifts back to the plaintiff employee to demonstrate that the employer's proffered reason for termination was merely pretextual and that the adverse employment decision was motivated by a desire to retaliate against the employee. *Id.*

In this case, Dickson clearly was subject to an adverse action when he was fired, but he cannot establish either the first or second element of his *prima facie* case of retaliation. His claim is subject to summary judgment on either basis. Further, even if he were able to state a *prima facie* case, he has not rebutted Sizemore's legitimate, non-retaliatory reason for firing him: his repeated instances of disrespect and insubordination. For these reasons, as discussed below, Sizemore is entitled to summary judgment on Dickson's THRA retaliation claim.

***(1) Plaintiff Did Not Engage in Activity Protected by the THRA.***

In his response in opposition to summary judgment, Dickson asserts that he engaged in protected activity when he "gave information to another employee, Adrianna Watson, and her attorney concerning Ms. Walton's complaint of gender discrimination under the Tennessee Human Rights Act." (Doc. No. 20, at 7.) In support of that assertion, Plaintiff cites to page 57 of his deposition testimony. The testimony to

which Plaintiff refers only indicates, however, that he told Watson that he would testify on her behalf. Merely telling someone, privately, that he would testify for her does not qualify as activity protected under the THRA. *See* Tenn. Code Ann. § 4-21-301(1). Plaintiff does not point to any evidence that he actually took any action in opposition to alleged discrimination by Sizemore, nor did he testify in support of Watson's claim, whether in a deposition or in a trial or hearing. Likewise, there is no evidence indicating he spoke with Watson's attorney, provided evidence, or assisted in any way in any investigation concerning Watson's charges. Dickson's unsupported assertions in his brief indicating he participated in Watson's attorney's investigation do not constitute evidence. Although not required to do so, the Court has combed the record and has not located any evidence supporting Dickson's claim that he engaged in activity of the type protected by the THRA. Because Dickson has failed to establish the first element of his *prima facie* case of retaliation in violation of the THRA, his THRA claim must fail.[2]

***(2) Sizemore Had No Knowledge of Plaintiff's Support of Watson's Suit.***

Even assuming that Dickson's telling Watson he would testify on her behalf constituted protected activity, there is no evidence in the record that Kent White knew about that conversation. Kent White testified unequivocally that at the time he made the decision to fire Dickson, he did not know that Dickson had told Walton he would testify in connection with her discrimination lawsuit against Sizemore. (White Dep. at 56:8–18.) Dickson asserts in his brief that his "belief that Ms. Watson had been discriminated against in Defendant's decision not to promote her . . . was well known to his superiors, including those involved in the decision to discharge Plaintiff" (Doc. No. 20, at 7); he also claims White must have known because Dickson "made no secret of his support for Ms. Walton's suit." (Doc. No. 21 (Pl.'s Resp. to Def.'s

---

[2] In his brief, Dickson also appears to be asserting that he engaged in protected activity when he repeatedly complained to management about the performance of a black colleague, who Dickson apparently believed was not adequately disciplined for failing to perform his job duties. Dickson insinuates that the reason his colleague was not adequately disciplined was because he was African-American and Sizemore feared a discrimination lawsuit. Dickson admits, however, that he has no knowledge of whether his black colleague was disciplined for the alleged infractions of company policy (Dickson Dep. at 46:14 – 47:15), and he also acknowledges that this employee was demoted and eventually fired from the company. (Dickson Dep. at 45:22–24; 85:10–11.) In any event, Dickson has not demonstrated that complaints about a colleague's performance constitute "protected activity" under the THRA.

Statement of Undisp. Facts), Resp. to ¶ 8 (citing Dickson Dep. at 57).) Once again, the actual evidence in the record does not support Dickson's assertions.

In the deposition testimony to which the plaintiff cites in support of his "belief," Dickson testified as follows:

> A Well . . . she [Adrianna Walton] asked me to testify for her for being discriminated against and asked me would I speak for her, and I said I would.
>
> Q Okay. Did Kent White hear her ask you to do that?
>
> A No.
>
> Q Was anybody else around to hear her ask you to do that?
>
> A After she filed her lawsuit, you know he'd know about it, and after he knows about it, then he knows that I'm a potential troublemaker, and then that's how management come [sic] after you.
>
> Q So Kent White knew about her lawsuit?
>
> A He had to.
>
> Q Okay. My question to you was how would Kent White know that Adrianna Walton specifically asked you to be a witness for her and to provide testimony for her?
>
> A Only through the lawsuit papers 'cause my name was on them.[3]
>
> Q How do you know that he saw those papers?
>
> A I would assume, he being a regional manager and all that being brought up, I think the company would let him know. I would.
>
> Q So you don't know, sitting here today, whether or not he saw any –
>
> A No.
>
> Q – specific lawsuit papers?
>
> A No.
>
> Q And you don't know, sitting here today, whether or not Kent White knew that Adrianna Walton had asked you to testify on her behalf?
>
> A I wouldn't know, no.

(Dickson Dep. at 57:2 – 58:12.)

---

[3]Plaintiff's name does not appear in Walton's complaint (Doc. No. 14-3), and it is not clear to what other lawsuit papers he might have been referring.

In other words, other than pure speculation on Dickson's part, there is no evidence in the record to refute White's statement that he did not know that Dickson had told Walton he would testify in her lawsuit at the time White made the decision to fire Dickson. Dickson has not presented any admissible evidence to create an issue of fact as to whether Sizemore or its agents knew at the time he was fired that he had engaged in any activity that could be construed to be protected by the THRA. Because Dickson cannot establish the second element of his *prima facie* case of retaliation, Sizemore is entitled to summary judgment of Dickson's THRA claim on this ground as well.

***(3) Plaintiff Cannot Rebut Sizemore's Legitimate, Non-retaliatory Reasons for Firing Him.***

Even if Dickson were able to state a *prima facie* case of THRA retaliation, Sizemore has presented ample evidence of legitimate, non-retaliatory reasons for firing Dickson: his poor attitude, insubordination and repeated instances of disrespect for colleagues and superiors.

Dickson attempts to create a disputed issue of fact as to whether Sizemore's proffered reason for firing him was pretextual by arguing that Sizemore either exaggerated or fabricated the grounds for taking disciplinary action against him twice during the spring of 2006, prior to his firing and after he allegedly made known his support for Adrianna Watson's discrimination suit. Notwithstanding, the factual disputes behind the prior disciplinary actions do not constitute material issues of disputed fact as to whether Sizemore's proffered reasons for firing Dickson are pretextual (even assuming that Sizemore knew that Dickson intended to testify for Walton in her lawsuit), for several reasons. First, Sizemore does not contend that Dickson was fired because of these prior disciplinary actions; rather, he was fired because of his attitude during the final counseling session that took place in June 2006. Second, Dickson does not deny that other employees reported to White that Dickson had taken actions they believed to be in violation of company policy. In other words, with respect to both disciplinary actions taken in the spring of 2006, White had an objectively reasonable basis for believing that disciplinary action was appropriate, regardless of whether Dickson refuted the version of events that had been presented to White. In each case, discipline took the form of a notation in Dickson's file and a counseling conference with White, and

Dickson was given an opportunity to respond to the complaints made against him.[4] The fact that he refuted the factual basis for the complaints is therefore simply irrelevant. *Cf. Felder v. Nortell Networks Corp.*, 187 Fed. Appx. 586 (6th Cir. 2006) (noting in Title VII context that as long as an employer honestly believed the proffered reason for its employment action, and that honest belief is reasonably based on particularized facts, then the employee cannot establish pretext even if the employer's reason is ultimately found to be mistaken or baseless).

In sum, Dickson has not proffered any competent, admissible evidence to suggest that Sizemore's reasons for firing him are pretextual. On this basis as well, Sizemore is entitled to summary judgment in its favor on Dickson's THRA retaliation claim.

**C. Plaintiff's TPPA Claim Likewise Fails.**

To establish a cause of action under the TPPA, also referred to in Tennessee case law as the "whistleblower statute," *see, e.g.*, *Mason v. Seaton*, 942 S.W.2d 470, 475 (Tenn. 1997), a plaintiff must prove (1) he was employed by the defendant; (2) he refused to participate in or to remain silent about illegal activities; (3) his employment was terminated; and (4) his refusal to participate in or to remain silent about illegal activities was the *sole* reason for his termination. *Merryman v. Central Parking Sys., Inc.*, No. 01A01-9203-CH-00076, 1992 WL 330404 (Tenn. Ct. App. Nov. 13, 1992); *Griggs v. Coca-Cola Employers Credit Union*, 909 F. Supp. 1059, 1063 (E.D. Tenn. 1995). Tennessee courts have further elaborated, with respect to the second element, that the TPPA "requires a situation in which an employee must either remain silent about an illegal activity or face the possibility that he may be discharged." *Merryman*, 1992 WL 330404, at *7. Other cases have clarified that "there must be a fear of dismissal contemporaneous with the plaintiff's decision whether to report the illegal activities." *Henderson v. Corrections Corp. of Am.*, 918 F. Supp. 204, 210 (E.D. Tenn. 1996), *quoted in Guy v. Mutual of Omaha Ins. Co.*, 2001 WL 204485, at *11 (Tenn. Ct. App. March 1, 2001).

In this case, it is not clear what illegal activity Dickson maintains he refused either to participate in or to remain silent about. In the sole paragraph in his brief addressing his TPPA claim, he asserts that he was terminated "due to his notation of a safety hazard in a guard report and complaint that Captain Larry

---

[4] Up until the counseling session in June 2006, Dickson was not suspended or demoted, nor were his hours or pay docked.

Earls failed to address the safety hazard." (Doc. No. 20, at 9.) Under the TPPA, the term "illegal activities" "means activities which are in violation of the criminal code of this state or the United States or any regulation intended to protect the public health, safety or welfare." Tenn. Code Ann. § 50-1-304(c). Plaintiff has not pointed out a specific safety regulation that would apply to the situation involving the broken chair. The Court therefore finds that Dickson has not demonstrated that Sizemore or its agents were engaged in any "illegal activity" as defined by the statute.

Moreover, even assuming that failure immediately to replace the broken chair in the guard house constitutes the violation of some "regulation intended to protect the public health, safety or welfare," Dickson has not presented evidence suggesting he was explicitly or implicitly directed to remain silent about that supposedly illegal activity, nor has he alleged that he "face[d] the choice between reporting illegalities and keeping [his] job." *Griggs*, 909 F. Supp. at 1063. Because the law requires that a plaintiff, to prove violation of the TPPA, show he had a "fear of dismissal contemporaneous with [his] decision to report the illegal activities," *id.*, Dickson is unable to prove the second element of his TPPA claim. Sizemore is therefore entitled to summary judgment of Dickson's TPPA claim.

Moreover, Dickson has not demonstrated that he was fired *solely* "due to his notation of a safety hazard in a guard report and complaint that Captain Larry Earls failed to address the safety hazard." (Doc. No. 20, at 9.) Instead, the admissible evidence indicates he was disciplined because of the way he dealt with the situation involving the broken chair and subsequently fired because of his attitude during the counseling session. On this ground too, Plaintiff's TPPA claim fails.

**D. Plaintiff Has Abandoned His Common-Law Retaliation Claim**

In his complaint, Plaintiff indicated his intent to state a cause of action under Tennessee common law for retaliatory discharge. However, he made no mention of the common-law claim in his theory of the case as set forth in the proposed Case Management Order (Doc. No. 5), nor did he address Sizemore's contention that he had abandoned his common-law claim in his response in opposition to summary judgment. The Court therefore finds that Dickson has intentionally abandoned such a claim.

If he had not abandoned the claim, it would still be subject to dismissal. To prove a common law cause of action for retaliatory discharge, Dickson would have to show:

(1) an employment at-will relationship;

> (2) a clear declaration of public policy which imposes duties upon the employee or employer; and
>
> (3) discharge of the employee for refusing to violate those duties.

*Reynolds v. Ozark Motor Lines, Inc.*, 887 S.W.2d 822, 824 (Tenn. 1994), *cited in Griggs*, 909 F. Supp. at 1070. Further, such an action will lie *only* "where the employer has violated a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision." *Reynolds*, 887 S.W.2d at 823. Dickson has not established the existence of a clear declaration of public policy as articulated by statute or regulation that would apply to his situation, much less that he violated such a policy or that his discharge arose from such violation. Thus, to the extent Dickson still has a viable claim for common-law retaliatory discharge, Sizemore is entitled to summary judgment on that claim is well.

**IV. CONCLUSION**

For the reasons set forth above, the Court finds that there are no disputed issues of material fact and the defendant, Sizemore, Inc., is entitled to summary judgment in its favor as to all the plaintiff's claims. Sizemore's motion for summary judgment will therefore be granted and this matter dismissed. An appropriate order will enter.

Thomas A. Wiseman, Jr.
Senior U.S. District Judge